NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CAMDEN VICINAGE

_____
:
Margaret O'NEILL, :
    Plaintiff, :
:
  v. :
: Civil No. 18-0698 (RBK/KMW)
COMMISSIONER OF SOCIAL :
SECURITY, : **OPINION**
:
    Defendant. :
_____:

**KUGLER**, United States District Judge:

    This matter comes before the Court upon the appeal of Plaintiff Margaret O'Neill for review of the final decision of the Commissioner of Social Security. (Doc. No. 1). The Commissioner denied Plaintiff's application for Social Security Disability Insurance ("SSID") benefits, finding that Plaintiff was not disabled as defined by the Social Security Act. As explained below, the decision of the Commissioner is **AFFIRMED.**

I.    **BACKGROUND**[1]

**A. Procedural and Plaintiff's History**

---

[1] Because the record is voluminous, the Court sets forth only those facts necessary for context and most relevant to the instant motion. "R." in citations refers to pages in the administrative record. Additional facts are set forth as needed in the "discussion" section below.

On May 9, 2013, Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning October 15, 2012. The claim was denied initially on September 10, 2013, and upon reconsideration on February 22, 2014. Plaintiff then filed a written request for hearing on April 4, 2014. Plaintiff appeared and testified at a hearing held on April 14, 2016, in Pennsauken, New Jersey. In a decision dated August 2, 2016, the ALJ found that Plaintiff was not disabled. (R. at 155). On November 16, 2017, the Appeals Council affirmed the ALJ's decision. Plaintiff then filed this action.

Plaintiff was forty-eight years old and lived at home with her husband, daughter, and granddaughter at the time of the hearing before the ALJ. (R. at 165, 168). During this period, Plaintiff was 5'6'' tall and weighed 220 pounds. (R. at 152). Her BMI was 37.3, which is considered obese, according to the Adult BMI Calculator of the Centers for Disease Control. *Id.* Plaintiff finished high school and completed approximately two years of college education, as well as received nurse, surgical, and medical assistant training. (R. at 147). She has worked for approximately fifteen years as a surgical technician instructor. (R. at 170). She has also worked as a surgical technician. *Id.*

Plaintiff alleges that her impairments directly led to her inability to continue working as a surgical technician instructor. (R. at 166). Plaintiff stated she stopped working as of October 15, 2012 because her cardiologist would not let her work any longer; however, Plaintiff's work history reports show that she worked until January 25, 2013. (R. at 147).

At her administrative hearing, Plaintiff testified about her mental health limitations. Plaintiff testified that she has seen a psychiatrist for treatment since 2005. (R. at 140). In

addition, Plaintiff sees a therapist twice a week since 2012 as well as another therapist every two weeks for anxiety. (R. at 147). Plaintiff was diagnosed with an adjustment disorder with depressed, mood, and bipolar disorder and suffers from anxiety. (R. at 141). She has been prescribed various medications to treat her depression, bipolar, and anxiety, including Latuda, Abilify, Paxil, and Neurontin, Xanax, and Paxil. (R. at 141, 174). Plaintiff also testified she had multiple suicidal thoughts connected with her mental health conditions. (R. at 178).

Plaintiff further provided testimony about her physical limitations. Specifically, Plaintiff has a past medical history significant for coronary artery disease, hypertension, chronic obstructive pulmonary disorder, emphysema, anemia, degenerative disc disease, and degenerative joint disease of the knees. (Pl's Br. [Doc. No. 9] at 4). She stated that she suffered from extreme chest pressure and pain with significant shortness of breath and pain in her. *Id.* Plaintiff also described having been hospitalized on multiple occasions as a result of this ongoing shortness of breath and chest pain. *Id.*

Plaintiff further testified that since her cardiac problems began, her days were mostly sedentary. (R. at 141). Plaintiff liked to read, spend time on the internet, watch television, and listen to music. *Id.* Plaintiff denied having any problems with personal care and indicated that she could cook, clean, vacuum, and do laundry as split 50/50 with her husband. *Id.* At the time of the hearing, Plaintiff made her granddaughter breakfast before school, attended aqua therapy five days a week for two to four hours a day, and was able to drive short distances. (R. at 142). Plaintiff further testified that in social settings she had no difficulties interacting with others. *Id.*

**B. ALJ Hearing and Medical Evidence**

In finding the Plaintiff not disabled, the ALJ considered Plaintiff's relevant medical history and examinations. Plaintiff's relevant medical history spans several years and includes various physical and mental complications. The following briefly notes the relevant medical evaluations pertinent to the ALJ's decision. These evaluations include those done by Dr. Iqbal, Dr. Iofin, Dr. Shetty, Dr. Wilchfort, and the State Agency Medical Consultants.

### 1. Dr. Iqbal in 2012

In October 2012, Plaintiff entered the hospital for chest pain and shortness of breath. (R. 390). Shortly thereafter, Dr. Iqbal examined her and found no extremity blocks, an enlarged cardiac silhouette, hyper-inflated lungs, signs of chronic obstructive pulmonary disorder ("COPD"), pleural thickening, and parenchymal scarring. (R. 390–91). He then noted that Plaintiff could only lift five pounds after her hospital discharge.

### 2. Dr. Iofin in 2013

Dr. Iofin examined the Plaintiff in July 2013. There, Dr. Iofin noted Plaintiff's depression, problems with sleep, irritability, crying spells, and generalized anxiety. As part of this consultative examination, Dr. Iofin diagnosed Plaintiff with disorders relating to depression, anxiety, and panic. He also assigned a Global Assessment of Functioning ("GAF") score of 60.

### 3. Dr. Shetty in 2014

In November 2012, Plaintiff began treatment with Sanjay Shetty, M.D., who is board-certified in cardiology, nuclear medicine, and echocardiography, for coronary artery disease and primary hypercoagulable. In his 2014 evaluation, Dr. Shetty opined that Plaintiff was capable of sedentary work less than 20 hours per week. He also indicated that Plaintiff suffered from depression and anxiety. He found that Plaintiff was fatigued; however, he concluded that her fatigue should only prevent Plaintiff from performing normal full-time work on an occasional basis. He also concluded that Plaintiff would have to miss work more than four times a month. Dr. Shetty also noted that Plaintiff's CAD s/p PCID CAD, Angina, Hx PE, DVT, hypercoagulable state on the form provided to the ALJ.

### *4. Dr. Wilchfort in 2015*

In June 2015, Samuel Wilchfort, M.D, who is board-certified in cardiovascular disease and internal medicine, consultatively examined Plaintiff. During an initial evaluation, Plaintiff reported she was having ongoing chest pain that she described as a crushing pain on the right side of her neck going into her shoulder. Plaintiff stated that this chest pain was relieved with nitroglycerin. Plaintiff also explained that a nuclear stress test in January 2014 was abnormal. She reported right knee pain and that she was told she needed a total knee replacement. She also alleged low back pain due to herniated discs and a recent epidural injection in February 2015. Plaintiff disclosed that, at the time, she was taking medications such as Xarelto, Cardizem, Coreg, Imdur, Neurontin, Plavix, Protonix, Paxil, Xanax, and Tramadol.

Dr. Wilchfort's physical examination of Plaintiff showed Plaintiff was 5'5", weighed 270 pounds, and had multiple ecchymoses on her arms and legs from anticoagulation, blood pressure of 124/70, clear lungs, normal heart, no edema, normal neurological examination, normal muscle

strength, normal range of motion throughout except lumbar bending to 80 degrees and knee flexion to 130 degrees, mild crepitus on the right, and negative straight leg raise.  During this examination, Plaintiff reported that she could not squat.  Following the examination, Dr. Wilchfort diagnosed Plaintiff with coronary disease with chest pain syndrome, hypertension, controlled, right knee pain, chronic low back pain with a history of herniated discs, high cholesterol, morbid obesity, and history of DVT in the past.

In addition, Dr. Wilchfort completed a separate medical source statement, which showed Plaintiff could occasionally lift and carry 10-20 pounds, sit for one hour at a time and for four hours in an eight-hour workday, and stand or walk for thirty minutes at one time and for one hour in an eight-hour workday.  Dr. Wilchfort also found that Plaintiff could frequently reach, handle, finger, feel, push, or pull, occasionally operate foot controls on the right, and frequently operate foot controls on the left.  He further found that Plaintiff could occasionally balance and never climb, balance, stoop, kneel, crouch, or crawl.  From this examination, Dr. Wilchfort concluded that Plaintiff could frequently be exposed to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, and vibrations.

### 5. *State Agency Psychologists*

The State Agency Psychological consultants found that Plaintiff could understand, remember, and execute simple routine instructions/tasks, sustain concentration, pace, and persistence, socially interact adequately, and adapt to changes.  The consultants further found that Plaintiff could perform light work, but never climb ladders, ropes, or scaffolds, occasionally climb ramps or stairs or crawl, and frequently balance, stoop, kneel, and crouch.  The consultants

ultimately found Plaintiff suffered from a severe mental impairment and that she had to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, and all exposure to hazards, such as machinery and heights.

### C. ALJ's Decision

The ALJ followed the five-step sequential evaluation process for determining disability claims and found that Plaintiff was not disabled on August 2, 2016. *See* 20 C.F.R. § 404.1520(a)(4). First, the ALJ found that Plaintiff has not engaged in substantial gainful activity since October 15, 2012. (R. at 140). Second, the ALJ found that Plaintiff had the following severe impairments: obesity, coronary artery disease, status post stenting, hypertension, anemia, history of chronic obstructive pulmonary disorder ("COPD"), degenerative disc disease, and degenerative joint disease of the knees. The ALJ then found that Plaintiff had the following non-severe impairments: depressive disorder, NOS, bipolar disorder, and anxiety disorder.

Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app'x 1. (R. at 144). Fourth, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, but that she was limited to sitting up no more than half hour at a time, low stress work, and only occasionally climbing ramps, stairs, and stoops. The ALJ also found that Plaintiff must avoid exposure to dust, fumes, pulmonary irritants, humidity, and temperature extremes. (R. at 146). The ALJ concluded that Plaintiff would be off task five percent of the workday. (R. at 147). Finally, the ALJ relied on testimony from a vocational expert who averred that although Plaintiff could not perform her past work during the relevant period, she was capable of performing other jobs that existed in significant numbers in

the national economy. (R. at 154). The ALJ therefore found that Plaintiff was not disabled during the relevant period.

## III.   DISCUSSION

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ used the established five-step evaluation process to determine whether Plaintiff was disabled. *See* 20 C.F.R. § 404.1520.

For the first four steps of the evaluation process, the claimant has the burden of establishing her disability by a preponderance of the evidence. *Zirnsak v. Colvin*, 777 F.3d 607, 611–12 (3d Cir. 2014). First, the claimant must show that she was not engaged in "substantial gainful activity" for the relevant time period. 20 C.F.R. § 404.1572. Second, the claimant must demonstrate that she has a "severe medically determinable physical and mental impairment" that lasted for a continuous period of at least twelve months. 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 404.1509. Third, either the claimant shows that her condition was one of the Commissioner's listed impairments, and is therefore disabled and entitled to benefits, or the analysis proceeds to step four. 20 C.F.R. § 404.1420(a)(4)(iii). Fourth, if the condition is not equivalent to a listed impairment, the claimant must show that he cannot perform his past work, and the ALJ must assess the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 404. 1520(e).

If the claimant meets her burden, the burden shifts to the Commissioner for the last step. *Zirnsak*, 777 F.3d at 612. At the fifth and last step, the Commissioner must establish that other

available work exists that the claimant is capable of performing based on her RFC, age, education, and work experience. *Id.*; 20 C.F.R. § 404.1520 (a)(4)(v). If the claimant can make "an adjustment to other work," she is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(v).

Here, Plaintiff appeals the ALJ's decision on three issues. First, Plaintiff contends the ALJ erred in finding Plaintiff's mental health impairments were non-severe at step two. Second, Plaintiff argues the ALJ erred in rejecting essentially all of the medical and lay opinion evidence of the record because the ALJ misstated the content of that evidence, mischaracterized the conclusions of the evidence, and relied on irrelevant factors to reject those opinions. Finally, Plaintiff argues that remand is appropriate because the Vocational Expert's testimony on which the ALJ relied requires clarification regarding his off-task percentages.

## 1. Whether substantial evidence supports the ALJ's step-two finding of non-severe mental impairments

Plaintiff first argues that the ALJ erred in failing to find that Plaintiff's mental health impairments were severe. Specifically, Plaintiff charges that the ALJ ignored the treatment records of her treating psychiatrist, Dr. Kammiel. While the ALJ concluded these notes were largely illegible, Plaintiff argues that many of the notes were printed and therefore the ALJ's stated reasoning was improper.

At step two of the five-step sequential inquiry, the ALJ must determine whether the claimant has a medically severe impairment or combination of impairments. *See Bowen v. Yuckert,* 482 U.S. 137, 140–41 (1987); *see also* Social Security Ruling (SSR) 86–8, 1986 SSR LEXIS 15, at *6–7; SSR 85–28, 1985 SSR LEXIS 19, at * 1. Under the applicable regulations, an impairment is severe only if it significantly limits the claimant's physical or mental ability to

do "basic work activities," *i.e.*, physical "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," or mental activities such as understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). A "severe" impairment is distinguished from "a slight abnormality," which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of her age, education, or work experience. *See Bowen,* 482 U.S. at 149–51. The claimant has the burden of showing that an impairment is severe. *Id.* at 146 n.5.

Plaintiff's argument at step two is not entirely accurate because it misinterprets the Third Circuit's language in *McCrea*. There, the court made clear that the burdens on the plaintiff at this stage are "not an exacting one." *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). The court then explained that the purpose of this step is to serve as a "*de minimis* screening device to dispose of groundless claims." *Id.* (citing cases). Plaintiff here attempts to use this language to support the notion that the ALJ incorrectly concluded that the mental impairments were non-severe. Plaintiff then recites the record to show that Plaintiff made a *de minimis* showing.

This Court disagrees with Plaintiff's reading of *McCrea*. This case only governs when an ALJ *denies* a person's benefits at step two. Since the ALJ did not deny the claim at this step, the Court must consider if Plaintiff's argument carries when the finding at step two is bifurcated, *i.e.*, when the ALJ finds only mental or physical impairments to be severe, but not both at step two, and the analysis proceeds to step three.

The Third Circuit has held that a bifurcated severity determination at step two is not automatic grounds for remand. In *Salles*, the court explained, "[b]ecause the ALJ found in [plaintiff] Salles' favor at step two, even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless." *See Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007). This Court similarly found that Plaintiff's step-two challenge did not automatically remand the case when the ALJ properly considered the non-severe impairments at the RFC determination. *Wells v. Acting Comm'r of Soc. Sec.*, No. 15-6048, 2016 WL 6824369, at *4 (D.N.J. Nov. 18, 2016). The central focus thus turns on whether the ALJ considered the non-severe impairment forming Plaintiff O'Neill's RFC.

**2. Whether substantial evidence supports the ALJ's RFC determination**

Plaintiff makes two central arguments in challenging the ALJ's RFC determination. First, and related to the argument above, Plaintiff states that the ALJ did not properly consider her mental impairments. Next, Plaintiff argues that the ALJ lacked a reasonable basis in assigning weight to various medical opinions.

**a. The ALJ's finding of non-severe mental impairments**

The ALJ must "consider all . . . medically determinable impairments . . . including [those] that are not 'severe'" when assessing the RFC. 20 C.F.R. § 404.1545(a)(2). The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. Only after that may the RFC be expressed in terms of the exertional levels of work—sedentary, light, medium, heavy, and very heavy. SSR 96-8p. Relatedly, the ALJ is responsible for assigning weight to the medical opinions of record. *See* 20 C.F.R. § 404.1527. The ALJ must, however, "explain the basis for

his or her conclusions." *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). If evidence is rejected, "an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter v. Harris*, 642 F.2d 700, 711 (3d Cir. 1981). The explanation need not be comprehensive; "in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981).

Here, Plaintiff offers little to support her argument that the ALJ erred in failing to consider Plaintiff's mental impairments. In addition to conflating the analysis at step two with the RFC determination, Plaintiff simply misrepresents the ALJ's discussion and consideration of her mental impairments. First, the ALJ clearly considered her mental disorders, depressed mood, bipolar disorders, and treatment at length. (R. at 141–44). Second, with respect to *one* doctor, the ALJ merely noted that much of the treatment notes were illegible. Contrary to Plaintiff's argument, this brief mention of illegibility is not an adequate basis for remand. *See Swanson v. Comm'r of Soc. Sec.*, No. 15-cv-8894, 2017 WL 825199 at *4–5 (D.N.J. Mar. 2, 2017) (finding the ALJ had no duty to consider mostly illegible treatment notes) (citing cases holding similarly). Not only does Plaintiff ignore the fact that the ALJ considered her mental impairments, but Plaintiff has not shown how any prejudice resulted from the contents of these illegible treatment notes.

Courts throughout the country have rejected such illegibility arguments when, as is the case here, Plaintiff has not shown prejudice. *See, e.g.*, *Mireles ex rel. S.M.M. v. Comm'r of Soc. Sec.*, No. 13-cv-699, 2014 WL 4854426, at *5–6 (W.D. Mich. Sept. 29, 2014) (rejecting the plaintiff's argument that illegible portions of the administrative hearing transcript could represent significant and relevant testimony of importance to the determination of the merits because

plaintiff did not show any prejudice resulting from the portion of the testimony cited in his brief (citing *Williams v. Barnhart*, 289 F.3d 556, 557–58 (8th Cir. 2002)) ("Absent an indication that the missing portion of the transcript would bolster appellant's arguments or prevent judicial review, this Court will not remand a case based upon inaudible portions of the record.")).

Plaintiff next seems to suggest that because the ALJ's discussion of her mental impression did not occur within the area of the opinion devoted to the RFC, the ALJ has not properly considered the impairments as required under 20 C.F.R. § 404.1545. This Court does not agree with Plaintiff's formalistic reading of RFC determinations. First, the Third Circuit makes clear that an ALJ need not "use particular language or adhere to a particular format in conducting his analysis." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). Thus, the question is not whether the portion of the opinion discussing RFC mention every impairment, rather it is whether the decision, "read as a whole, illustrates that the ALJ considered all appropriate factors in reading the conclusion that [Plaintiff] did not meet the requirements for any listing . . . ." *Id.* This Court therefore rejects Plaintiff's formalist argument and finds that the ALJ carefully considered Plaintiff's mental impairments and treatments in the RFC determination. (R. at 141–44).

### b. The ALJ's weighing of medical evidence

The Court now turns to Plaintiff's next challenge to the RFC determination—that the ALJ lacked a reasonable basis in assigning weight to various medical opinions. Specifically, Plaintiff argues that the ALJ erred in assigning weight to the opinions of Dr. Iqbal, Dr. Shetty, Dr. Wilchfort, and the state agency medical consultants.

20 C.F.R. § 404.1527(c) sets forth factors to consider in determining how to weigh evidence from medical sources, including: (1) the examining relationship; (2) the treatment

relationship, including the length, frequency, nature, and extent of the treatment; (3) the supportability of the opinion; (4) its consistency with the record as a whole; and (5) the specialization of the individual giving the opinion. *See Labanda v. Comm'r of Soc. Sec.*, No. 17-cv-3354, 2018 WL 259948, at *1 (D.N.J. Jan. 2, 2018); *see also Michael Edward Davern v. Comm'r of Soc. Sec.*, 660 F. App'x 169, 172 (3d Cir. 2016) (noting that "the weight due a medical opinion depends on a variety of factors" under 20 C.F.R. § 404.1527(c)). An ALJ need not explicitly discuss each factor in his decision. *See Green v. Colvin*, No. 13-cv-03463, 2014 WL 3105037, at *7 (D.N.J. July 2, 2014). "Where inconsistency in evidence exists, the ALJ retains significant discretion in deciding whom to credit." *Ganges v. Comm'r of Soc. Sec.*, No. 17-cv-1982, 2018 WL 5342717, at *11 (D.N.J. Oct. 29, 2018) (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)). However, the ALJ "cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186 F.3d at 429 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)).

Here, Plaintiff first challenges the ALJ's treatment of Dr. Iqbal, who in November 2012, found that Plaintiff could only lift five pounds. The ALJ only gave the opinion some weight because the report was vague, conclusory, and dated. The ALJ also noted that the opinion did not make clear if the lifting restriction applied was temporary or permanent or whether it was work-related.

The ALJ properly considered the opinion of Dr. Iqbal. First, the Third Circuit makes clear that an ALJ has broad discretion in determining the credibility of medical opinions. More narrowly, it has affirmed ALJ determinations based on the same reasons at issue here. *See Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991) (explaining that vague and conclusory opinions

may be given little weight); *see also* 20 C.F.R. § 404.1512(a) (discussing relevant medical evidence).

Plaintiff's related challenges to the ALJ's weighing of medical opinions similarly fail. Again, our Circuit has interpreted the regulations clearly on this point. "The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). If "the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). In assigning weight to Dr. Wilchfort and the state agency medical consultants, the ALJ relied on proper reasons for assigning some or little weight. As explained above, an ALJ may assign less weight to an opinion that has conclusory language, vagueness, and evidentiary gaps. The ALJ therefore properly assigned weight to these opinions.

Plaintiff next challenges the ALJ's treatment of Dr. Shetty. Dr. Shetty opined that Plaintiff could perform sedentary work for less than 20 hours per week. (R. at 491). His treatment notes also indicate that Plaintiff's fatigue would only prevent her from performing normal full-time work on an occasional basis (three to four days per month). (R. at 493). In the opinion, the ALJ found Dr. Shetty's report to be "internally inconsistent" and gave it "some weight." (R. at 152).

Contrary to Plaintiff's argument, substantial evidence supports the ALJ's treatment of Dr. Shetty's opinion. First, Dr. Shetty's report offers seemingly contradictory conclusions. In one section, he states that Plaintiff can perform "sedentary work" for less than 20 hours per week. (R. at 491). In another area, he indicates that Plaintiff's fatigue will only prevent her from performing "normal, *full-time work* activities on an occasional (approximately 3-4 days per

month) basis." (R. at 493) (emphasis added). The ALJ here reasonably discounted the opinion at issue upon a reasonable reading of seemingly contradictory treatment notes. *See Smith v. Astrue*, 359 F. App'x 313, 316–17 (3d Cir. 2009) (treating opinion may be rejected if contradicted by physician's own treating notes or patient's daily activities). As such, this Court finds that substantial evidence supports the ALJ's treatment of the medical opinions at issue.

### 3. Whether substantial evidence supports the ALJ's finding of jobs

Plaintiff next challenges the ALJ's determination that, based on her age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. Specifically, Plaintiff argues that the Vocational Expert's ("VE") testimony is unclear and therefore creates a conflict with the DOT job descriptions. Meanwhile, the Defendant argues that substantial evidence supports the ALJ's determination, and that the alleged conflict, if any, is at most harmless.

At the fifth step of the evaluation process, "the ALJ often seeks advisory testimony from a vocational expert. In addition, the ALJ will generally consult the *Dictionary of Occupational Titles* ('DOT'), a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy, in order to determine whether any jobs exist that a claimant can perform." *Burns,* 312 F.3d at 119; *see also id.* at 126 ("[The] Social Security Administration has taken administrative notice of the reliability of the job information contained in the [DOT].") (citing 20 C.F.R. § 416.966(d)). The Social Security Regulations provide additional instruction in resolving conflicts in occupational information. SSR 00-4P.

> When there is an apparent unresolved conflict between VE evidence and the DOT, the adjudicator must elicit a reasonable explanation

> for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. Neither the DOT nor the VE evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE testimony rather than on the DOT information.

SSR 00-4P.

Here, the record indicates that the ALJ properly conveyed Plaintiff's limitations to the VE and determined that jobs existed in significant numbers in the national economy. At the ALJ hearing, the ALJ asked the VE to "assume an individual having the claimant's age, education and past work as described. Please assume that this individual is limited to sedentary work . . . [and] can only occasionally climb ramps and stairs . . . ." (R. at 188). The ALJ added additional restrictions consistent with Plaintiff's RFC. The VE then testified that given all of these factors, the individual would be able to perform at least three jobs with the requirements of representative sedentary unskilled work with an SVP of 2: a charge account clerk (DOT 205.367-014), an inspector (DOT 669.687-014), and a bench assembler (DOT 732.684-064). The VE then testified that a person could be "off task" for breaks up to ten percent of the time, but if a person is off task more than ten-to-fifteen percent of the workday, the work becomes "unmaintainable." (R. at 189 –90). The ALJ then asked the VE whether someone who was routinely off-task sixteen-to-twenty percent of the workday "in addition to breaks" could perform these jobs. The VE said they could not. Later, when Plaintiff's counsel asked about the tolerance for breaks in these settings, the VE explained, "if an individual needed an additional twenty-minute break somewhere in the day," beyond the two fifteen-to-twenty-minute breaks permitted each day, "it would probably preclude employment." (R. at. 190).

Plaintiff first argues that the ALJ's questions to the VE are unclear and therefore require this Court to remand the matter for clarity. Specifically, Plaintiff argues that the ALJ's second question's specific mention of "in addition to breaks" confuses the first question. We disagree. First, we note that Plaintiff's emphasis on the VE's testimony regarding "off task" periods of time seems irrelevant. SSR-004P focuses on the apparent conflict with the testimony and the DOT listing. Nothing in the record or in Plaintiff's brief suggests that the proffered jobs have specific "off task" constraints. Second, while Plaintiff cites to another case in this district that found these questions confusing,[2] this Court does not agree with its interpretation of these questions. Rather than read the questions in a vacuum, we have considered the transcript and view the second question as a natural outgrowth of the first. In the first question, the ALJ asked whether a person who was off-task for five percent of the workday could perform the job. The VE answered, yes. The ALJ then asked whether a person off task sixteen-to-twenty percent of the workday in addition to breaks could perform the job. The VE answered, no. Taken together, we find that being on- or off-task is unrelated to the breaks in one's work day. The questions therefore do not appear to create any overt ambiguity.

Plaintiff next argues that Plaintiff's counsel's later questioning of the VE created additional ambiguity. Plaintiff's counsel appears to alter the hypothetical by changing the percentage "off task" into minutes per day. At first, the VE testified that a person could be off-task for five percent of the workday and maintain employment. Plaintiff's counsel converted this five percent (of an eight-hour work day) to twenty-four minutes per day. Then, Plaintiff's counsel asked the VE if an additional break of twenty minutes would preclude employment. The VE answered, yes. Thus, Plaintiff argues that the VE's earlier testimony, that twenty-four

---

[2] See *Kirby v. Commissioner*, No. 16-cv-5159, 2017 WL 4330361 (D.N.J. Sept. 29, 2017).

minutes *off-task* per day would not preclude employment, is inconsistent with his later statement that a twenty-minute *break* would preclude employment. We disagree.

Plaintiff's attempt to parse minute differences and expand the ALJ's hypothetical is unpersuasive. First, the ALJ does not have a duty to respond to Plaintiff's counsel's attempts to expand the hypothetical question. Again, SSR-004P only focuses on apparent conflicts with the VE's testimony and the DOT listing, not attempted conflicts with the initial ALJ hypothetical and a newly revised one from Plaintiff's counsel. Second, even if we accept this contortion of testimony, the Court notes that nothing in the record indicates that being "off task" has to occur in one neat block of time. Thus, as Defendant aptly points out, the five-percent off-task period could occur in short periods throughout the day.

Finally, we note that, even if there was a discrepancy at the hearing, this Court is persuaded by the Seventh Circuit in *Donahue v. Barnhart* and finds that substantial evidence still supports the ALJ's decision. 279 F.3d 441, 447 (7th Cir. 2002). There, Judge Easterbrook considered what should result when a discrepancy between the VE's testimony and the DOT listings is *unexplored* during the hearing but is later raised by the plaintiff in challenging the ALJ's ruling. Judge Easterbrook provides a useful framework in identifying two instances. In one instance, the plaintiff questions the basis of the VE's conclusions at the hearing where the ALJ has a duty to make an inquiry to determine the reliability of the VE's conclusions. In the second instance, however, "raising a discrepancy only after the hearing, as [plaintiff's] lawyer did, is too late," and the ALJ "is not obliged to open the record." *Id.* Thus, while we find no apparent conflict in this matter, even if there was, we are guided by Judge Easterbrook's approach and decline to remand the matter.

## IV. CONCLUSION

For the reasons discussed above, this Court **AFFIRMS** the ALJ decision.

Dated:   1/31/2019                                                                    s/ Robert B. Kugler
                                                                                         ROBERT B. KUGLER
                                                                                         United States District Judge